Charles R. **DORSEY**, Plaintiff,

v.

**UNITED STATES** of America,
Defendant.

**PALM BEACH MORTGAGE COMPANY,**
Plaintiff,

v.

**UNITED STATES** of America,
Defendant.

Nos. 68–29–Civ. CF, 68–30–Civ–CF.

United States District Court,
S. D. Florida.

Nov. 17, 1969.

George H. Bailey, of Jones, Adams, Paine & Foster, West Palm Beach, Fla., for plaintiffs, Charles R. Dorsey and Palm Beach Mtg. Co.

Lavinia L. Redd, Miami, Fla., for defendant, U.S.A.

## MEMORANDUM OPINION

FULTON, Chief Judge.

These are two related tax refund suits. This Court has jurisdiction over the subject matter and parties pursuant to Title 28, United States Code, Section 1346(a) (1). Charles R. Dorsey v. United States is an action for refund of federal individual income taxes and assessed interest for the years 1958,

1961, and 1962, in the total amount of $19,719.09, plus interest as provided by law. Palm Beach Mortgage v. United States is an action for the refund of federal corporate income taxes and assessed interest for the fiscal years ending June 30, 1961, 1962, and 1964, in the total amount of $6,289.05, plus interest as provided by law. These cases were consolidated for non-jury trial at West Palm Beach, Florida, January 27, 1969. The cases share a common fact pattern, but involve different issues of law. Therefore, this memorandum opinion will first delineate the factual milieu from which the disputes arise and then give separate treatment to the legal problems.

## FACTUAL BACKGROUND

Charles R. Dorsey, Sr. had a well established mortgage and loan business in West Palm Beach, Florida. Dorsey and his colleagues became convinced that the business could be greatly expanded and made more competitive if it were incorporated in such manner as to become a Federal Housing Administration approved mortgagee.

Accordingly, the Palm Beach Mortgage Company was incorporated under the laws of the State of Florida on July 11, 1952. The Certificate of Incorporation provided for the issuance of capital stock of only one class, 1,000 shares of common stock having a par value of $10 per share. The common stock as originally issued was held by the following persons:

| | |
|---|---|
| Charles R. Dorsey, Sr. | 35 shares |
| Charles R. Dorsey, Jr. | 25 " |
| DeWitt T. Dorsey | 15 " |
| Harry F. LeCrenier, Jr. | 15 " |
| Wilma Richardson | 10 " |
| | 100 shares |

On July 25, 1952, Charles R. Dorsey, Sr. transferred $100,000 in cash, mortgage receivables and U.S. Treasury Bonds to the Company in exchange for four $25,000 notes bearing interest at 4% per annum, and payable to him on July 25, 1953, 1954, 1955 and 1956. This method of capitalization was decided upon be-

cause it was not intended that the Corporation should involve its own funds in the making of mortgage loans. Rather, the Company was to serve as a mortgage broker, becoming associated with landowners and contractors in such a way that it could locate prospective mortgagors. It would then process mortgage loans in conformity with FHA regulations, thereby deriving income from services which could only be performed by an FHA approved mortgagee. It was envisioned that the corporation would arrange construction loans through local banks. When buildings were completed and occupied and the FHA paper work completed, the mortgage loan would be placed with a permanent mortgagee, usually a large insurance company. The evidence discloses that this is precisely the way the Company did in fact function.

In August 1952, the Company made application to FHA for approval as a mortgagee under Section 203 of the National Housing Act (12 U.S.C. Section 1709). The Regulations promulgated under this section required that a mortgagee in the Company's category have "sound capital funds of not less than $100,000." Federal Housing Administration Regulations on Mutual Mortgage Insurance and Insured Home Improvement Loans, 24 C.F.R., Part 203, Section 203.4 (c). With its application the Company submitted a balance sheet showing, among other things, capital stock of $1,000 and "fixed liabilities" of $100,000. The "fixed liabilities" consisted of the four $25,000 notes payable to Charles R. Dorsey, Sr. By letter dated August 20, 1952, the FHA advised the Company that the notes payable were not acceptable in lieu of capital stock. The Company, by its attorney, R. Bruce Jones, Esquire, wrote a letter to FHA September 19, 1952, asking whether preferred stock rather than common stock would be acceptable, and if so, whether such preferred stock could be made payable or refundable on demand, instead of having a fixed maturity date. The FHA replied by letter on September 24, 1952,

that preferred stock would be acceptable, and that no particular maturity date would be required since " * * * we assume the preferred stock would be issued so that it could be redeemed at the wishes of the company." In that letter FHA cautioned the Company that it must maintain at all times a net worth of $100,000 in acceptable assets, whether such assets were held in the form of preferred stock or undivided profits.

It thus became clear that Dorsey's plan to advance $100,000 to the Corporation in such way as to create a corporate debt in his favor in that amount would not meet FHA requirements for approved mortgagees. In order for the Corporation to qualify for FHA approval, it would be necessary for Dorsey to contribute $100,000, or securities of that value, as corporate equity, not as corporate debt. Furthermore, in order for the Corporation to maintain its FHA approval, it would have to maintain a capital account at all times equivalent to $100,000. If its capital fell below that figure, the Corporation would lose its FHA approval. However, if Dorsey took preferred stock in return for his capital contribution of $100,000, FHA was agreeable to the liquidation of that stock by the Company as rapidly as the undistributed profits of the Corporation would permit. As long as earned profits were sufficient to maintain the equity of the Corporation in excess of $100,000, the Corporation could liquidate the Dorsey preferred stock at any time without endangering its FHA approval.

Based on these understandings derived from the exchange of correspondence between the Company and FHA, the Company, on October 20, 1952, amended Article III of its Certificate of Incorporation with the following resolution:

RESOLVED: That the Certificate of Incorporation of PALM BEACH MORTGAGE COMPANY, be amended so as to read as follows:

Article III: *Capital Stock*

The capital stock of this corporation shall consist of 1,000 shares of the par value of $10.00 per share and 1,000 shares of preferred stock of the par value of $100.00 per share; all or any part of the common or preferred stock of this corporation may be paid for wholly or in part in cash and/or may be issued wholly or in part for cash, services, labor, exchange of either class of stock for the other, or for the purchase of property at a just valuation to be fixed by the Board of Directors.

The holders of preferred stock shall be paid interest thereon at the rate of 4 per cent per annum payable semi-annually, which interest shall be paid irrespective of whether the company makes any profits.

This stock shall be redeemed by the company on or before the 17th day of October, A.D. 1956. Preferred capital stock shall have no voting power whatsoever.

In the event of the liquidation of this corporation by dissolution, bankruptcy or termination, the par value of all the preferred stock and all the cumulated interest thereon shall be paid in full before the common stock or any part thereof is paid.

RESOLVED FURTHER: That the Directors of this company believe it is advisable to amend the Certificate of Incorporation as herein proposed and that a meeting of the stockholders of record entitled to vote be called for the consideration thereof.

The 1,000 shares of preferred stock were issued to Charles R. Dorsey, Sr. on October 20, 1952, and the $100,000 in notes payable to him were cancelled.

On October 22, 1952, the Company renewed its application for approval as a mortgagee by FHA. This was done by a letter to FHA from R. Bruce Jones, Esquire, which informed FHA that the Company had issued 1,000 shares of 4% preferred stock, so that it then had $101,000 worth of common and preferred stock outstanding. A Certificate from a Certified Public Accountant demonstrating the financial structure of the Company and reflecting a capital of $101,000, and a

bank credit reference were attached to Jones' letter. On November 3, 1952, the FHA granted the Company's application, and the Company operated as an FHA approved mortgagee during the periods in issue in this lawsuit.

The evidence indicates that the securities which Dorsey transferred to the Corporation in exchange for preferred stock consisted largely of mortgage loans, which the Corporation continued to service, and which were never converted to cash. These securities never constituted part of the working capital of the Corporation, nor were they ever intended to serve that purpose. They were not used for the purpose of making any loans or for any other aspect of Company business, except to meet and maintain the $100,000 equity position required by FHA. The $100,000 capital account served no corporate purpose except satisfaction of the FHA requirement. The success of the corporate venture depended entirely upon finding, processing and placing mortgage loans, using the funds of other parties. The evidence in this case demonstrates that this Corporation would not have been undercapitalized for its business purposes without the $100,000, except for purposes of its FHA approved mortgagee status.

Payments of 4 per cent per year on the preferred stock were made to Charles R. Dorsey, Sr. The following payments were made for the fiscal years indicated:

| FY ending | Amount |
|-----------|--------|
| 6/30/61 | $3,600.00 |
| 6/30/62 | 3,400.00 |
| 6/30/64 | 2,800.00 |

On its corporate income tax returns for those fiscal years the Company deducted these payments as "interest." The Internal Revenue Service disallowed these deductions, giving rise to the deficiencies involved in Case No. 68–30–Civ–CF, Palm Beach Mortgage Co. v. U.S.A. The issue to be determined in that case is whether the payments to Charles R. Dorsey, Sr., of 4 per cent per year on preferred stock were interest on indebtedness and thus deductible by the Company, or non-deductible dividends.

The preferred stock was redeemed by the Company as follows:

| Date | No. of Shares | Payment to Charles R. Dorsey, Sr. |
|------|---------------|-----------------------------------|
| 6/30/58 | 100 | $10,000 |
| 9/21/61 | 100 | 10,000 |
| 7/30/62 | 100 | 10,000 |

When the stock was redeemed, the word "cancelled" and the date was written across the face of the certificate, and the cancelled certificates were pasted back into the stock certificate book. Dorsey did not include the $10,000 payments in his income tax returns for the years 1958, 1961 and 1962. The Internal Revenue Service included the payments in his income as dividends, giving rise to the deficiencies in Case No. 68–29–Civ–CF, Charles R. Dorsey v. U.S.A.

## PALM BEACH MORTGAGE CO. v. U.S.A.

The Company claims a deduction for the 4 per cent payments it made to Mr. Dorsey on the preferred stock he held. This deduction is sought under Section 163(a) of the Internal Revenue Code of 1954 which permits a deduction for interest paid on *indebtedness;* however, "interest" which is in reality a dividend cannot be deducted in computing taxable income. Treas.Reg. § 1.163–1(c) (1957). The question, therefore, is whether the preferred stock represented debt or capital.

The Company argues that when it was incorporated it had $1,000 in capital and $100,000 in notes payable to Charles R. Dorsey, Sr., with the notes representing loans to the Company by Dorsey. When the Company had to alter its capital

structure to comply with FHA requirements, the original intent to be indebted to Dorsey, Sr. was not changed. Therefore, under the Company's view, the preferred stock actually represented indebtedness and the 4% payments were deductible as interest.

█ Even if the original intent was to create an indebtedness, the plan had to be changed to gain FHA approval. The FHA required "sound *capital* funds of not less than $100,000," which under the facts of this case means something other than indebtedness was required as condition precedent to approval. The balance sheet of the Company carried the preferred stock as capital, or equity. The Certificate of Incorporation called it capital. When the preferred stock was issued, the notes payable and the indebtedness they represented were cancelled. The Company's attorney and accountant referred to the stock as capital. On cross examination the Company's attorney admitted that Mr. Dorsey as the holder of preferred stock could not receive payments ahead of the general creditors of the Company. One of the hallmarks of true indebtedness is the unconditional and unsubordinated obligation to pay. See Curry v. United States, 396 F.2d 630 (5 Cir. 1968) and cases cited therein. Repayment of Dorsey's contribution was conditional upon the success of the Corporation's business in producing profits. Finally, a true lender is concerned with interest. Curry v. United States, *supra*. Dorsey assigned interest bearing securities to the Corporation, so that the Corporation became entitled to the interest which belonged to Dorsey before the assignment. Interest could not have been a consideration of either Dorsey or the Corporation, because the Corporation was required to pay the interest it collected to Dorsey.

█ It can safely be said that there is virtually no evidence that this $100,-000 constituted debt. This was well stated by government counsel at trial, as follows:

[W]e feel that the evidence is undisputed, that the corporation may not have a deduction for interest or indebtedness, because no true indebtedness existed between the corporation and Mr. Dorsey. (Transcript, p. 74)

In short, the National Housing Act required the Company to have a minimum amount of capital, and the Company complied. It cannot now be heard to say that what was capital for the National Housing Act was indebtedness for the Internal Revenue Code. The Company's intent for purposes of the National Housing Act fixed its position under the Internal Revenue Code. The taxpayer cannot have it both ways. Accordingly, this Court finds that the preferred stock represented capital and the payments of 4% thereon were dividends, and not interest payments on indebtedness. No deduction is allowable under Section 163 (a) of the Internal Revenue Code of 1954.

## CHARLES R. DORSEY v. U.S.A.

Charles R. Dorsey did not include the $30,000 which he received upon the redemption of his preferred stock in his income tax returns for the years 1958, 1961 and 1962. Under the Internal Revenue Code of 1954, Sections 302(a) and (b) (1), these redemptions would be nontaxable if they were not essentially equivalent to dividends paid by the Company to Dorsey. It is the position of the government that the payments were essentially equivalent to dividends, and therefore taxable as income to Dorsey.

█ It is axiomatic that tax questions are intricate by nature and each case must be considered and determined on its unique fact situation. Seldom is a single guideline or test conclusive. Berkowitz & Kolbert v. United States, 411 F.2d 818 (5 Cir. 1969); Harlan, et al. v. United States, 409 F.2d 904 (5 Cir. 1969). The leading case in this Circuit on this problem is United States v. Fewell, 255 F.2d 496 (5 Cir. 1958), in which the Court of Appeals listed the

following seven criteria as relevant to the consideration whether a particular corporate distribution is essentially equivalent to a dividend:

1. Whether there was a bona fide corporate business purpose;
2. Whether the initiative for the distribution came from the corporation or from the participating stockholders;
3. Whether earnings and profits were available for dividends;
4. Whether the transaction resulted in any substantial change in the ownership or control of the corporation;
5. Whether the transaction was the result of or resulted in a contraction of the corporation's business or narrowed its activities;
6. Whether the distribution was substantially pro rata among the stockholders; and
7. Whether the stock required by the corporation was cancelled and retired or held as treasury stock.

These factors are not exclusive, and other criteria may be of equal importance in a given fact situation. Conversely, some of the above criteria may not apply to a particular case. A discussion of these criteria as they apply to this case follows.

The redemption of the stock served a valid corporate purpose by relieving the company of its contractual obligation to pay further semi-annual interest at the rate of 4% per annum. These redemptions came in due course as part of the implementation of the plan developed at the inception of the Company. It was a necessary step in fulfilling the original corporate purpose of operating as an FHA approved mortgagee. The existence of the intention to redeem the preferred stock as an integral part of the original plan indicates that the redemption did serve a valid corporate purpose. Cobb v. Callan Court Co., 274 F.2d 532 (5 Cir. 1960). It had been the intention of Dorsey at all times to redeem the preferred stock provided he could do so without reducing the Company's capital account below $100,000. This intention was known and approved by FHA. Earnings and profits were available for dividends. In fact, the Company had enjoyed earned surplus each year since its inception. Nevertheless, no cash dividends were ever paid on the common stock. Occasional dividends in the form of common stock were issued to the holders of common stock. The common stock controlled by Mr. Dorsey for tax purposes consisted of that common stock owned directly by him and that owned by his son. Dorsey, Sr. has continued to control 65% of the common stock at all times relevant to this case, since May 16, 1968, prior to the first redemption of preferred stock. While Dorsey's equity in the net worth of the Company continued to increase, his *percentage* of actual and constructive ownership decreased after each cancellation of preferred stock. Of course, the cash distribution for the liquidation of the preferred stock was not substantially pro rata among the stockholders, since Dorsey held the only preferred stock issued by the Company. Finally, as mentioned earlier in this opinion, the preferred stock reacquired by the Company was cancelled and retired and not held as treasury stock. This was in accordance with the original intent and purpose of Dorsey, the Company, and even FHA.

■ From the foregoing considerations, the Court has concluded that the payments by the Company to Dorsey totaling $30,000 in redemption of the preferred stock were not essentially equivalent to dividends, and that such sums are not taxable to him as income.

This memorandum opinion shall serve as findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52. Counsel for the government shall forthwith prepare and submit to the Court a form of judgment in accordance therewith.